IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| JOEL RUIZ and MARIA RUIZ, husband and wife; and JOEL Z. RUIZ, individually,<br><br>                   Plaintiffs,<br><br>    v.<br><br>HAMMER & NAILS, LLC, an Idaho limited liability company; OLDCASTLE MATERIALS, INC., a Delaware corporation; and STAKER & PARSON COMPANIES, a Utah corporation d/b/a IDAHO CONCRETE COMPANY,<br><br>                   Defendants.<br>_____ | Case No. 2:10-CV-1021-SU<br><br>FINDINGS AND RECOMMENDATION |

SULLIVAN, Magistrate Judge:

      Plaintiffs Joel and Maria Ruiz, residents of Ontario, Oregon, filed this action against Hammer & Nails, LLC, an Idaho limited liability company ("H&N"), Staker & Parson Companies d/b/a Idaho Concrete Company, a Utah corporation, and its parent company Oldcastle Materials, Inc., a Delaware corporation (collectively "Idaho Concrete"). Plaintiffs allege a claim for strict products liability against Idaho Concrete. Plaintiffs also assert claims for breach of contract and breach of warranty of fitness for a particular purpose against H&N. Against both parties, plaintiffs

Page 1 - FINDINGS AND RECOMMENDATION

allege claims for negligence and/or res ipsa loquitur, as well as violations of Oregon's Unlawful Trade Practices Act ("UPTA"). Jurisdiction is based upon diversity under 28 U.S.C. § 1332. Plaintiffs' claims stem from allegations that the concrete foundation of their home is deteriorating because of wrongful acts by H&N and/or Idaho Concrete. Both parties have denied plaintiffs' allegations. Pursuant to Fed. R. Civ. P. 56, Idaho Concrete moves for summary judgment on all of plaintiffs' claims against it. For the reasons set forth below, Idaho Concrete's motion should be denied.

## BACKGROUND

On or about July 2, 2007, plaintiffs entered into a contract with H&N, a general contractor, pursuant to which H&N agreed to provide work and materials to construct a residence for plaintiffs. Compl. ¶ 9; *see also* Tharp Aff. Ex. A. H&N could not find a locally licensed concrete subcontractor to build the foundation for plaintiffs' home. Tharp Aff. Ex. B ("Nelson Dep."), at 70:15-74:3. Accordingly, H&N elected to pour the foundation itself and hired employees with concrete subcontracting experience. *Id.* This was the first and only residential foundation job that H&N completed on its own. *Id.* at 17:8-16, 71:7-23.

H&N's primary supplier of concrete was Idaho Concrete. *Id.* at 25:10-26:7. After performing the initial excavation, H&N ordered five deliveries of 3,000 psi "5-bag" concrete from Idaho Concrete for plaintiffs' foundation. *Id.* at 37:14-40:11; Capper Aff. ¶ 12. Typically, upon delivery, the general contractor has an opportunity to inspect each batch of concrete; if the concrete is too dry to be workable, the contractor can ask the delivery truck driver to add water. *See* Nelson Dep. 75:6-76:12; Tharp Aff. Ex. F ("Barbion Dep."), at 20:3-21:9; *id.* at Ex. D ("Capper Dep."), at 105:17-106:19. Idaho Concrete requires its employees to complete delivery tickets and record how

much water, if any, is added to each batch. Barbion Dep. 15:11-14; Tharp Aff. Ex. E ("Corfield Dep."), at 21:11-22; *see also* Capper Aff. Ex. B ("Delivery Tickets").[1] Idaho Concrete also instructs its employees not to add water to the concrete mix unless explicitly requested by the contractor. Capper Aff. ¶ 22; *see also* Barbion Dep. 20:10-21:9; Capper Dep. 77:24-78:11; Corfield Dep. 17:14-15; Tharp Aff. Ex. G ("Hawkins Dep."), at 16:19-17:5. The water gauges in Idaho Concrete's delivery trucks are not always accurate, so employees may have to estimate amounts when adding water. Barbion Dep. 23:7-24:24.

On July 16 and 17, 2007, Idaho Concrete delivered the concrete to H&N at the location of plaintiffs' proposed house. Compl. ¶ 10. Before each delivery, Idaho Concrete's computerized concrete batch mixer generated reports. Tharp Aff. Ex. H ("Batch Reports"). Idaho Concrete's Batch Reports indicate that the water/cement ratios for each batch ranged from 0.50 to 0.60. *See* Batch Reports; Boicourt Aff. ¶ 4 & Ex. B. Idaho Concrete documented a single request from H&N that six gallons of water be added to one of the five concrete loads intended for the foundation. *See* Delivery Tickets.

In 2008, H&N completed construction of plaintiffs' house. Ruiz Aff. ¶ 7. Plaintiffs paid H&N and, by extension, Idaho Concrete, pursuant to their contract. Compl. ¶ 11. In April or May 2009, plaintiffs noticed the foundation flaking away and deteriorating in various places. Ruiz Aff. ¶ 8. At plaintiffs' request, Idaho Concrete and H&N visited the house to view the foundation deterioration. Nelson Dep. 41:7-18; Capper Dep. 32:10-19. Idaho Concrete acknowledged the problem and sent concrete flakes from the foundation to its supplier, Ash Grove Cement Company,

---

[1] Only the first five delivery tickets refer to concrete for the foundation. Capper Dep. 85:21-87:7. The remaining tickets refer to 4000 psi concrete that was delivered for other work around plaintiffs' residence. *See* Pls.' Resp. to Mot. Summ. J. 36.

Page 3 - FINDINGS AND RECOMMENDATION

for testing. Capper Dep. 32:10-33:21, 38:3-39:12. On May 12, 2009, Ash Grove reported that the concrete contained "an excess of sulfate, likely from the groundwater or soil below the concrete." Tharp Aff. Ex. M. ("Ash Grove Report"). Idaho Concrete concurred with the Ash Grove Report and confirmed that excess sulfates were responsible for the damage. Compl. ¶¶ 13, 14; Ruiz Aff. ¶ 13.

Plaintiffs were suspicious of the report because other buildings on nearby soil were not experiencing the same deterioration. Ruiz Aff. ¶ 12. Plaintiffs therefore sought a second opinion from Materials Testing and Inspection ("MTI"), a neutral third-party, about the source of the deterioration. *Id.* at ¶ 16; Tharp Aff. Ex. K ("Shoemaker Dep."), at 14:9-15:19. The parties initially disagreed about who would pay for the test. Shoemaker Dep. 15:12-17:8. Ultimately, the parties agreed that, if plaintiffs paid for the test and the test determined that the concrete was faulty, then H&N and/or Idaho Concrete would pay for the test, as well as the foundation damage. *Id.* at 16:19-17:8; Ruiz Aff. ¶ 15; Capper Dep. 121:1-18.

On September 2, 2009, MTI tested core samples from the foundation and reported that, in addition to the sulfate, the concrete contained a higher water/cement ratio than is normal or desired. Tharp Aff. Ex. O ("MTI Report"). While the typical water/cement ratio for residential construction ranges from 0.40 to 0.65, the MTI Report stated that the water/cement ratio for plaintiffs' foundation exceeded 0.70. *Id.* The MTI Report also stated that the water/cement ratio resulted in high permeability, which is considered a material defect that greatly reduces the strength of the foundation and causes the concrete to deteriorate. *Id.*; Compl. ¶ 17; Boicourt Aff. ¶¶ 13-14. In order to produce the concrete's exceptionally high water/cement ratio, 50-75 gallons of excess water must have been added to each batch of foundation concrete. Boicourt Aff. ¶ 4 & Ex. B. In sum, a total of 250-375 gallons of additional water were added to create the exceptionally high water/cement ratio

found in plaintiffs' foundation. *Id.*

On August 30, 2010, plaintiffs filed a complaint in this Court, alleging claims for: (1) breach of contract against H&N; (2) strict products liability against Idaho Concrete; (3) negligence against H&N; (4) negligence against Idaho Concrete; (5) res ipsa loquitur against H&N and/or Idaho Concrete; (6) breach of implied warranty for a particular purpose against H&N; and (7) violation of the UTPA, Or. Rev. Stat. §§ 646.608, 646.638, against H&N and Idaho Concrete. *See generally* Compl. On October 29, 2012, Idaho Concrete filed a motion for summary judgment on plaintiffs' strict products liability, negligence, res ipsa loquitur, and UTPA claims. The Court heard oral argument on June 18, 2013.

### STANDARD OF REVIEW

Summary judgment is appropriate if the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file, if any, "show that there is no genuine dispute as to any material fact and that the [moving party] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The authenticity of a dispute is determined by whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine

issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec.*, 809 F.2d at 630.

## DISCUSSION

### I. Products Liability Statute

Plaintiffs allege that Idaho Concrete manufactured and/or sold defective concrete. Compl. ¶ 34. Idaho Concrete argues that Oregon's products liability statute, Or. Rev. Stat. § 30.900 *et seq.*, governs plaintiffs' strict products liability, negligence, and res ipsa loquitur claims. *See* Def.'s Mem. in Supp. of Mot. Summ. J. 6. As such, Idaho Concrete does not distinguish between plaintiffs' multiple allegations and theories of liability, and only provides argument and evidence in favor of summary judgment regarding plaintiffs' strict liability claim pursuant to Or. Rev. Stat. § 30.920.[2] *See generally id.* Idaho Concrete also contends that it is entitled to a complete defense to plaintiffs' products liability claims pursuant to Or. Rev. Stat § 30.915.[3] *Id.* at 10-12.

---

[2] The strict liability provision of the products liability statute provides, in relevant part, that "[o]ne who sells . . . any product in a defective condition unreasonably dangerous to . . . the property of the user or consumer is subject to liability for . . . damage to property caused by that condition, if: (a) The seller . . . is engaged in the business of selling . . . such a product; and (b) The product is expected to and does reach the user or consumer without substantial change in the condition in which it is sold." Or. Rev. Stat. § 30.920(1). This rule "shall apply, even though: (a) The seller . . . has exercised all possible care in the preparation and sale . . . of the product; and (b) The user, consumer or injured party has not purchased . . . the product from or entered into any contractual relations with the seller." Or. Rev. Stat. § 30.920(2). Further, "[n]othing in this section shall be construed to limit the rights and liabilities of sellers . . . under principles of common law negligence." Or. Rev. Stat. § 30.920(4).

[3] This defense applies "to a products liability civil action [where] an alteration or modification of a product occurred under the following circumstances: (1) The alteration or modification was made without the consent of or was made not in accordance with the instructions or specifications of the manufacturer, distributor, [or] seller; (2) The alteration or modification was a substantial contributing factor to the . . . property damage; and (3) If the

Page 6 - FINDINGS AND RECOMMENDATION

Plaintiffs concede that they are uncertain about whether Oregon's products liability statute applies and, if so, to which claims. *See* Pls.'s Resp. to Mot. Summ. J. 40. Regardless, plaintiffs argue that disputed issues of material fact preclude summary judgment. *Id.* at 33-40.

As used in Or. Rev. Stat. §§ 30.900 through 30.920, a "product liability civil action" refers to any "civil action brought against a manufacturer, distributor, seller or lessor of a product for . . . property damage arising out of: (1) Any design, inspection, testing, manufacturing or other defect in a product; (2) Any failure to warn regarding a product; or (3) Any failure to properly instruct in the use of a product." Or. Rev. Stat. § 30.900. Thus, "'[p]roducts liability' is the umbrella term for the liability of a manufacturer, seller or other supplier of chattels, to one with whom he is not in privity of contract, who suffers physical harm caused by the chattel." *Griffith v. Blatt*, 334 Or. 456, 461 n.3, 51 P.3d 1256 (2002) (citation and internal quotations omitted). Liability for a defective product "may rest upon the supplier's negligence . . . or it may be based on strict liability in tort." *Id.*; *see also Simonsen v. Ford Motor Co.*, 196 Or. App. 460, 466-67, 102 P.3d 710 (2004), *rev. denied*, 338 Or. 681, 115 P.3d 246 (2005).

Whether something is a "product" within the meaning of the statute is a question of law. *See Ass'n of Unit Owners of Bridgeview Condominiums v. Dunning*, 187 Or.App. 595, 615, 69 P.3d 788 (2003); *Sease v. Taylor's Pets*, 74 Or.App. 110, 115, 700 P.2d 1054 (1985). In Oregon, completed buildings are not "products" under Or. Rev. Stat. § 30.900. *Harris v. Suniga*, 209 Or.App. 410, 421-22, 149 P.3d 224 (2006); *Bridgeview Condominiums*, 187 Or.App. at 617. Materials used to construct a building, however, may be products for the purposes of a products liability claim. *See,*

---

alteration or modification was reasonably foreseeable, the manufacturer, distributor, [or] seller gave adequate warning." Or. Rev. Stat. § 30.915.

Page 7 - FINDINGS AND RECOMMENDATION

*e.g.*, *Brokenshire v. Rivas & Rivas, Ltd.*, 142 Or.App. 555, 562-63, 922 P.2d 696 (1996) (contractor who sold and installed a dangerously slippery floor could be held strictly liable under products liability statute); *see also George v. Western Homes Corp.*, 2007 WL 2138602, *1-2 (D.Or. July 21, 2007).

While the parties have not cited to, and the Court is not aware of, any precedent stating a general rule as to ready-mix concrete, Oregon case law supports the proposition that Idaho Concrete is a seller and/or manufacturer of a product, i.e. concrete. Further, plaintiffs' allegations regarding strict products liability, negligence, and res ipsa loquitur are all claims for property damage arising out of a "design, inspection, testing, manufacturing or other defect in a product." Or. Rev. Stat. § 30.900; *see also* Compl. ¶¶ 18-19, 31-38, 44-53; Pls.' Resp. to Mot. Summ. J. 31-40. Therefore, these claims are all product-related and, as such, are governed by Oregon's products liability statute.[4] *See Bancorp Leasing & Fin. Corp. v. Agusta Aviation Corp.*, 813 F.2d 272, 276-77 (9th Cir. 1987); *George*, 2007 WL 2138602 at *1-2.

### A. Strict Liability Claim

Plaintiffs allege that Idaho Concrete is responsible under a strict products liability theory because it supplied concrete with a defect that caused their foundation to deteriorate. Compl. ¶¶ 31-

---

[4] The parties' briefs focus principally on the strict liability provision of the products liability statute. *See generally* Def.'s Mem. in Supp. of Mot. Summ. J.; Pls.' Resp. to Mot. Summ. J.; Def.'s Reply to Mot. Summ. J. In other words, the parties' briefs are silent as to why the products liability statute, rather than common law, applies to plaintiffs' negligence and res ipsa loquitur claims. *Id.* The Court acknowledges, however, that some of plaintiffs' allegations may fall outside of this statutory scheme. *See Simonsen*, 196 Or.App. at 468-73 (citations omitted). For example, a claim for negligent conduct before the sale of a product would be subject to the products liability statute, whereas a post-sale claim for negligence would not be subject to that statute. *Id.*; *see also Ensley v. Strato-Lift, Inc.*, 116 F.Supp.2d 1175, 1183 (D.Or. 2000) ("[d]efendant has cited no cases, and I have found none, holding that a [common law] negligence action cannot co-exist with a viable strict product liability claim").

38. To establish a strict products liability claim, the plaintiff must prove that the elements of Or. Rev. Stat. § 30.920 are met. *McCathern v. Toyota Motor Corp.*, 332 Or. 59, 79, 23 P.3d 320 (2001); *Griffith*, 334 Or. at 466. Under Or. Rev. Stat. § 30.920, one who sells "any product in a defective condition unreasonably dangerous . . . to the property of the user or consumer is subject to liability for . . . damage to property caused by that condition, if [t]he seller . . . is engaged in the business of selling . . . such a product; and [t]he product is expected to and does reach the user or consumer without substantial change in the condition in which it is sold." Or. Rev. Stat. § 30.920(1). In other words, the plaintiff bears the burden of establishing that the product was defective when it left the seller's hands. *Ensley v. Strato-Lift, Inc.*, 134 F.Supp.2d 1191, 1193 (2001).

Idaho Concrete argues that plaintiffs cannot meet their burden because they failed to demonstrate that any defective condition existed in the concrete before H&N accepted delivery. Def.'s Mem. in Supp. of Mot. Summ. J. 7-10. Idaho Concrete relies on its computer generated Batch Reports, which indicate that the water/cement ratio was within an acceptable range. *Id.*; Batch Reports; *see also* Bloom Aff. ¶¶ 3-4, 26-27; Capper Aff. ¶¶ 2, 7-19 (indicating that the Batch Reports were accurate). Idaho Concrete also notes that H&N visually inspected and accepted the concrete, such that the concrete could not have been defective upon delivery. Bloom Aff. ¶¶ 16-20; Nelson Dep. 75:21-76:9, 78:11-15. In addition, Idaho Concrete emphasizes its policy that prohibits employees from adding water of their own accord. Def.'s Mem. in Supp. of Mot. Summ. J. 11; Capper Dep. 78:2-11. Based on this evidence, Idaho Concrete concludes that it is not at fault for the excessive water/cement ratio. Def.'s Mem. in Supp. of Mot. Summ. J. 10; *see also* Bloom Aff. ¶ 32.

While this evidence is sufficient to meet Idaho Concrete's initial burden, the Court finds that genuine issues of material fact remain regarding whether Idaho Concrete was responsible, in whole

Page 9 - FINDINGS AND RECOMMENDATION

or in part, for the excessive water/cement ratio. The Batch Reports are not determinative because there is no evidence regarding how they were prepared and at least one discrepancy exists therein between the ingredients and the total amount of concrete. *See* Pls.'s Resp. to Mot. Summ. J. 7, 34; Batch Reports; *see also* Boicourt Aff. ¶ 6. The Batch Reports also include handwritten numbers, apparently supplementing the data from the computerized batch printouts, further undermining their accuracy. *See* Batch Reports. Moreover, any water added to concrete batches during delivery may have been measured erroneously due to Idaho Concrete's trucks' inaccurate water gauges. *See* Hawkins Dep. 19:8-20:10; Barbion Dep. 18:16-21, 19:12-22, 23:17-24:24.

More importantly, the record reveals that there are multiple additional sources of extra water that could have increased the water/cement ratio before the concrete left Idaho Concrete's possession. *See* Boicourt Aff. ¶ 6. For example, the Idaho Concrete employee who operated the batch mixer may have erred in entering the water amount for each batch; inaccuracies may have also arisen in the process of weighing and measuring water due to a computer/mechanical error. *Id.* Further, errors could have resulted from inaccurate estimations about the water content in each batch's sand and stone ingredients, which both contain additional water. *Id.* After Idaho Concrete employees cleaned each delivery truck, gallons of excess water may have been left over in the trucks' mixer drums and ended up in later batches of concrete, increasing the water/cement ratio. *Id.*; *see also* Barbion Dep. 18:16-21; Hawkins Dep. 20:8-21:4. Idaho Concrete's employees admit that if they believe a batch needs additional water to meet an order's specifications, they may add water to the mix on their own initiative without recording it on the Delivery Tickets. Barbion Dep. 18:11-19:11; Hawkins Dep. 19:8-23; *see also* Boicourt Aff. ¶ 6.

Finally, in order to produce the concrete's exceptionally high water/cement ratio, 50-75

gallons of additional water must have been added to *each* batch of mixed concrete. Boicourt Aff. ¶ 8. That results in a total of 250-375 excess gallons of water, yet H&N denies adding any water to Idaho Concrete's deliveries at the job site. Nelson Dep. 51:5-9. The record reflects that only six gallons of water were added at H&N's request to one of the five deliveries of 3,000 psi "5-bag" concrete. *Id.* at 37:14-38:6; Delivery Tickets. Idaho Concrete had a policy of documenting whenever a contractor requested additional water and insists that it followed that policy in this case. *See* Delivery Tickets; *see also* Def.'s Mem. in Supp. of Mot. Summ. J. 10-11. From this, a reasonable jury could conclude that Idaho Concrete recorded any and all of H&N's water requests on the Delivery Tickets, accounting for only six of the 250-375 gallons of additional water. The fact that no record exists of H&N's additional water requests raises the inference that Idaho Concrete was, at least in part, responsible for the excessive water/cement ratio in plaintiffs' foundation.

Therefore, construing the evidence in the light most favorable to plaintiffs, genuine issues of material fact exist regarding whether the concrete was defective upon delivery. Therefore, Idaho Concrete's motion should be denied as to plaintiffs' strict liability claim pursuant to Or. Rev. Stat. § 30.920.

**B. Negligence Claim[5]**

Plaintiffs allege that Idaho Concrete is liable under a negligence theory for selling and/manufacturing defective concrete. Compl. ¶¶ 44-48. Liability for harm resulting from a defendant's allegedly negligent conduct turns on "whether that conduct unreasonably created a foreseeable risk to the protected interest of the kind of harm that befell the plaintiff," unless some

---

[5] Even if plaintiffs' negligence and res ipsa loquitur claims fall outside the purview of the products liability statute and instead lie in common law, summary judgment on those claims is nonetheless inappropriate for the reasons discussed herein.

Page 11 - FINDINGS AND RECOMMENDATION

special status, relationship, or specific standard defines the defendant's duty. *Hoyt v. Vitek, Inc.*, 134 Or.App. 271, 287, 894 P.2d 1225 (1995) (citation omitted); *see also Slogowski v. Lyness*, 324 Or. 436, 441, 927 P.2d 587 (1996) (outlining the elements of a negligence claim); *Simonsen*, 196 Or.App. at 468-72 (applying common law negligence elements to a products liability action proceeding under a negligence theory of liability). Whether conduct was negligent is a fact-specific inquiry. *Morehouse v. Haynes*, 350 Or. 318, 330, 253 P.3d 1068 (2011).

In moving for summary judgment, Idaho Concrete did not specifically address plaintiffs' negligence theory of products liability; rather, its only products liability argument pertains to Or. Rev. Stat. § 30.920, the provision regarding strict liability. *See generally* Def.'s Mem. in Supp. of Mot. Summ. J.; Def.'s Reply to Mot. Summ. J. However, as discussed above, a "product liability civil action" is not confined to a strict liability claim under Or. Rev. Stat. § 30.920 and can include negligence. As such, Idaho Concrete's argument based upon Or. Rev. Stat. § 30.920 does not encompass plaintiffs' allegations concerning negligence. For this reason, Idaho Concrete failed to carry its initial burden and its motion should be denied as to plaintiffs' negligence claim.

Furthermore, negligence claims are fact-specific and, as discussed above, a plethora of disputed factual issues exist regarding the source of the excess water and whether the concrete unreasonably created a foreseeable risk of harm to plaintiffs. For this additional reason, Idaho Concrete's motion should be denied as to plaintiffs' negligence claim.

### C. Res Ipsa Loquitur Claim

In the alternative, plaintiffs allege that the negligence of either H&N or Idaho Concrete, or both, caused excess water in the concrete, causing their foundation to deteriorate. Compl. ¶¶ 49-53. According to plaintiffs, res ipsa loquitur applies even if they cannot produce evidence about the

Page 12 - FINDINGS AND RECOMMENDATION

source of excess water because the concrete would not have been defective without the negligence of H&N and/or Idaho Concrete. *See* Pls.' Resp. to Mot. Summ. J. 32.

Res ipsa loquitur permits the inference of negligence or causation if the plaintiff establishes: "(1) that there is an injury, (2) that the injury is of a kind which ordinarily does not occur in the absence of someone's negligence, and (3) that the negligence that caused the event was more probably than not attributable to a particular defendant." *Hammer v. Fred Meyer Stores, Inc.*, 242 Or.App. 185, 190–191, 255 P.3d 598, *rev. denied*, 350 Or. 716, 260 P.3d 716 (2011) (citation and internal quotations omitted). This doctrine applies to cases involving multiple tortfeasors if the plaintiff can trace the cause of the alleged injury to each defendant. *Fieux v. Cardiovascular & Thoracic Clinic, P.C.*, 159 Or.App. 637, 643-46, 978 P.2d 429, *rev. denied*, 329 Or. 318, 994 P.2d 123 (1999); *Umpqua Aquaculture, Inc. v. Ron's Welding & Fabricators, Inc.*, 111 Or.App. 220, 224-25, 826 P.2d 31 (1992) ("[a]lthough the application of res ipsa loquitur requires a probability that a defendant has been involved in the injurious act, res ipsa loquitur is consistent with the truism that more than one defendant can be involved in an act or series of acts").

Summary judgment on plaintiffs' res ipsa loquitor claim should be denied because issues of material fact remain as to which party caused the concrete in plaintiffs' foundation to become defective.[6] As discussed above, the doctrine is applicable in cases with multiple defendants. *Fieux*, 159 Or.App. at 644. While plaintiffs may be unable to prove that Idaho Concrete was solely

---

[6] Idaho Concrete does not separately address plaintiffs' res ipsa loquitur claim in its initial memorandum in support of its motion for summary judgment. *See generally* Def.'s Mem. in Supp. of Mot. Summ. J. However, for the first time in its reply brief, Idaho Concrete argues that res ipsa loquitur is inapplicable in the present case due to multiple potential sources of plaintiffs' injury. *See* Def.'s Reply to Mot. Summ. J. 10-11. Ordinarily, courts decline to consider arguments first raised in a reply brief. *See, e.g.*, *Lentini v. Cal. Ctr. for the Arts, Escondido*, 370 F.3d 837, 843 n.6 (9th Cir. 2004).

Page 13 - FINDINGS AND RECOMMENDATION

negligent, they have introduced evidence sufficient to create a probability that Idaho Concrete caused, at least in part, the excessive water/cement ratio at issue. *See Umpqua Aquaculture*, 111 Or.App. at 224-25. Thus, Idaho Concrete's motion should be denied as to this claim.

### D. Statutory Defense

A complete defense exists to a products liability claim where an alteration or modification was: (1) "made without the consent of or was made not in accordance with the instructions or specifications of the manufacturer, distributor, [or] seller"; (2) "a substantial contributing factor to the . . . property damage"; and (3) accompanied by an "adequate warning" from the manufacturer, distributor, or seller where the alteration or modification at issue was reasonably foreseeable. Or. Rev. Stat. § 30.915.

Idaho Concrete contends that it is entitled to summary judgment under this statutory provision because H&N was responsible for adding the excess water that substantially altered or modified the concrete product. Def.'s Mem. in Supp. of Mot. Summ. J. 10. Accordingly, Idaho Concrete appears to be arguing that this complete defense applies for the same reasons summary judgment is allegedly proper. However, there are questions of fact regarding alteration, if any, of the concrete and whether it was made without the consent of Idaho Concrete. Additionally, disputed factual issues exist regarding whether, if there was an alteration by H&N, it was a substantial factor contributing to plaintiffs' property damage or accompanied by an adequate warning from Idaho Concrete. Therefore, because disputed issues of material fact exist regarding whether the concrete was defective when it left Idaho Concrete's possession, Idaho Concrete's motion based on Or. Rev. Stat. § 30.915 should be denied .

## II. Unfair Trade Practices Act

Page 14 - FINDINGS AND RECOMMENDATION

In addition to their products liability claims, plaintiffs allege that Idaho Concrete engaged in unlawful business practices, in violation the UTPA, by representing that the concrete was suitable for the foundation of their house. Compl. ¶¶ 62-67. Idaho Concrete argues that plaintiffs' UTPA claim fails because it is time-barred. Def.'s Mem. in Supp. of Mot. Summ. J. 12. Idaho Concrete also argues that this claim should be dismissed because plaintiffs have not proven any willful misrepresentation. *Id.*

### A. Statute of Limitations

Actions brought under the UTPA must be "commenced within one year from the discovery of the unlawful method, act or practice." Or. Rev. Stat. § 646.638(6). Under Oregon's discovery rule, the statute of limitations does not begin to run until the plaintiff knows or, in the exercise of reasonable care, should know facts that would make an objectively reasonable person aware of a substantial possibility that an injury occurred, the injury harmed one or more of the plaintiff's legally protected interests, and the defendant is the responsible party. *See Gaston v. Parsons*, 318 Or. 247, 256, 864 P.2d 1319 (1994); *Adams v. Or. State Police*, 289 Or. 233, 239, 611 P.2d 1153 (1980); *see also McCulloch v. Price Waterhouse LLP*, 157 Or.App. 237, 247-48, 971 P.2d 414 (1998), *rev. denied*, 328 Or. 365, 987 P.2d 510 (1999) (discussing the discovery rule in the context of an UTPA claim) (citations omitted).

Idaho Concrete contends that the statute of limitations began running when plaintiffs discovered the deteriorating foundation, in April or May 2009, such that any claim brought after May 2010 is time-barred. Def.'s Mem. in Supp. of Mot. Summ. J. 17. Because plaintiffs did not file suit until August 2010, Idaho concrete asserts that plaintiffs' UTPA claim falls outside of the statute of limitations. *Id.* The Court disagrees.

Page 15 - FINDINGS AND RECOMMENDATION

It is true that, in April or May 2009, plaintiffs' had sufficient knowledge to "excite attention and put a party upon his guard or call for an inquiry." *McCulloch*, 157 Or.App. at 247-48 (citation and internal quotations omitted). In other words, plaintiffs observed that their concrete foundation was deteriorating as of that date. Nevertheless, "a reasonably diligent inquiry [did not] disclose the fraud." *Id.* (citation and internal quotations omitted). In fact, plaintiffs contacted Idaho Concrete immediately upon discovering the foundation deterioration; the only initial explanation for the defect came from Ash Grove, Idaho Concrete's cement supplier, which blamed the deterioration on "an excess of sulfate, likely from the groundwater or soil below the concrete." Ash Grove Report; *see also* Ruiz Aff. ¶¶ 13-15. Thus, despite a swift and reasonable inquiry into the cause of the deterioration, as of May 2009, plaintiffs had no reason to suspect that a high water/cement ratio caused or contributed to the foundation's deterioration, or that Idaho Concrete was potentially responsible for the influx of excess water. Plaintiffs were not aware of the cause of the alleged injury and the proper defendants until they received the MTI Report in September 2009. *See* Ruiz Aff. ¶¶ 14, 17. Because this action was commenced in August 2010, within one year of plaintiffs' discovery, plaintiffs' UTPA claim is timely.

### B. Misrepresentation

Plaintiffs allege that Idaho Concrete willfully misrepresented the suitability of the concrete used in their foundation. Compl. ¶¶ 63-64. An entity violates the UPTA when it "[r]epresents that . . . goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities that they do not have." Or. Rev. Stat. § 646.608(1)(e).[7] To prevail on a claim

---

[7] As Idaho Concrete notes, plaintiffs do not specify which provision or provisions of the UPTA their claim is brought under. *See generally* Compl.; Pls.' Resp. to Mot. Summ. J. As such, the Court acknowledges that there may be other provisions outside of Or. Rev. Stat. §

Page 16 - FINDINGS AND RECOMMENDATION

under this subsection, the plaintiff must prove that the defendant's representation was willful. *See Rathgeber v. James Hemenway, Inc.*, 335 Or. 404, 410, 69 P.3d 710 (2003). "A willful violation occurs when the person committing the violation knew or should have known that the conduct of the person was a violation." Or. Rev. Stat. § 646.605(10). Thus, the UTPA requires "no more than proof of ordinary negligence by a defendant in not knowing, when it should have known, that a representation made by him was not true." *State ex rel. Redden v. Disc. Fabrics, Inc.*, 289 Or. 375, 385, 615 P.2d 1034 (1980); *see also* Or. Rev. Stat. § 646.608(2) ("[a] representation under subsection (1) of this section or ORS 646.607 may be any manifestation of any assertion by words or conduct, including, but not limited to, a failure to disclose a fact").

Idaho Concrete argues that plaintiffs' UTPA claim fails because they have not shown evidence of an affirmative willful misrepresentation. Def.'s Mem. in Supp. of Mot. Summ. J. 13. However, whether Idaho Concrete actually knew that the concrete was defective due to an excessive water/cement ratio when it warranted that the concrete was of a sufficient compression strength to be used as the foundation in plaintiffs' residence is immaterial. The fact that Idaho Concrete may have been negligent in authorizing the concrete for that use is sufficient for the purposes of the UPTA. *See State ex rel. Redden*, 289 Or. at 385 ("a defendant is liable for misrepresentations made negligently, without evidence that it was attended by either conscious ignorance or reckless indifference to its truth or falsity"); Or. Rev. Stat. § 646.608(2). Viewing the evidence discussed above in the light most favorable to plaintiffs, a reasonable jury could infer that Idaho Concrete rendered the concrete defective by adding additional water and/or failed to take reasonable precautions to ensure that the concrete's water/cement ratio was within an appropriate range before

---

646.608(1)(e) that are applicable to plaintiffs' UPTA claim.

Page 17 - FINDINGS AND RECOMMENDATION

representing it as suitable for the foundation. *See Rathgeber*, 335 Or. at 412-13. Moreover, while not dispositive, H&N notes there was a shortage of cement at the time of construction, which suggests that Idaho Concrete may have had a motive for adding excess water to plaintiffs' concrete. *See* Nelson Dep. 68:19-69:11. In sum, a reasonable jury could infer that Idaho Concrete knew or should have known that the concrete had an excessive water/cement ratio and was therefore not suitable for plaintiffs' residential foundation at the time of delivery, but failed to disclose this fact. Accordingly, Idaho Concrete's motion for summary judgment should be denied as to plaintiffs' UTPA claim.

## RECOMMENDATION

For the foregoing reasons, Idaho Concrete's Motion for Summary Judgment (docket # 50) should be DENIED.

## SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due August 30, 2013. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

DATED this 13th day of August, 2013.

    /s/ Patricia Sullivan
Patricia Sullivan
United States Magistrate Judge